We'll now hear argument in the Inouye, Jersey Tractor-Trailer Training Incorporated for Wawa versus Jersey Tractor-Trailer. We're losing our crowd. Boy, it is really fun sitting back here with all of this stuff. Do you think so? Uh-huh. Oh, back in my past mind when I was when I was sitting over here. You really can. You really can. Ahem. I'm sure others have problems. Ahem. Ahem. Ahem. Mr. Gregg? Thank you, Your Honor. When Your Honor, may it please the Court, Corey Gregg, Greenberg, Trowery, on behalf of the appellant, Gil Factor, and J. L. L. Sid. At the outset, may I ask the Court to allow me to reserve three minutes for rebuttal. Great. Thank you, Your Honor. Your Honor, the facts in this case are really not in dispute. Both the Bankruptcy Court and the District Court on Appeal found facts that should have given rise to a different legal result had the Uniform Commercial Code provisions that are applicable to this been applied properly. Which code provision? We are talking about 9.315. Exactly. The Secured Purchase of a Secured Party permits the release of its lien by consent either expressed or implied. And also 9.330 and 3.31, which allow a purchaser of instruments to pay free of a prior secured party's interest. And 3.31, which gives protections of a holder in due course to, for example, as mentioned in Commentary 5, to 3.31 factors who would otherwise be junior of the University. But the cases you've given us in your brief, you're citing to the former UCC provision and not the revised. Absolutely, Your Honor. Which has made it a little bit difficult. It has made it a little bit difficult. There is precious little law under the new Uniform Commercial Code, 9.315. But there is a difference. There is a difference. The difference being that... And you have a tougher road under the revised provision. Under the revised 3.15a.1. There is no doubt about that. It uses the word authorized, doesn't it? It uses the word authorized free of the security interest. Free of the security interest. That's the difference here. It authorizes the disposition free of the security interest. Yes, that's right, Your Honor. And that is different than 9.306. But what we have argued is that the factual scenarios that underlie 9.306, where the authorization of the release was permitted by the prior security party, the senior security party, still apply here. That's kind of either expressed release or implied release. If you're under the former, under 3.062, implicit is enough. Knowing that there was factoring and allowing it to continue would have been enough. But that's not the revised one. Your Honor, respectfully, I believe it is the revised one. I believe the authorization can be either expressed or implied. Would you take issue with an argument that the former provision is more in the nature of a kind of a stopper? I didn't hear the last part. That the former provision would provide for something more like an estoppel theory that could prevail for you. But that here, when we're talking about authorizing disposition free of a security interest, something far more active is required of the bank, isn't it? Your Honor, I don't believe that it is. And the question is how does one find an authorization? Surely, if we were litigating this under 9.306. How does one authorize? Right. What is one authorizing here? Is it authorizing the disposition? Here, authorizing the sale of collateral. Authorizing free of a security interest is another matter. Does the word authorize apply to both? I think it does condition both clauses of 9.315. So that the authorization would be the disposition free of a security interest. So that's the only disposition the statute is speaking to in terms of its plain language? That is the only authorization of the statute. Why would a bank like Wawel, that has everything tied up in a UCC1 as Wawel did, want to authorize such a disposition? There are a number of reasons why a bank may want to authorize it. I can't argue with that. On this record? On this record it doesn't say why the bank would. It just says that the bank did. What the bankruptcy court found, and what I think the UCC1 that was filed on behalf of Wawel showed, and what the security agreement showed, is that the debtor here was free to do whatever it wanted with the collateral. It could sell it. It could further encumber it. It could compromise it and not collect it. And in those circumstances, the UCC provides that upon disposition of the collateral, Wawel's security interest is not eliminated. It continues to have a security interest in the proceeds of the sale of the collateral. And that security interest continues for a period of 21 days after the sale. In other words, while Wawel told Jersey Tractor, go ahead and sell your accounts receivable, that's fine with us, Wawel still had a remedy, and that remedy was that it had an interest in the proceeds of those sales. Where is your evidence that Wawel sold, that the collateral was sold free of the security interest, that Wawel authorized the sale free of the security interest? I think it was in Mr. Ransinger's testimony. Free of the security interest. Well, he said that there were no restrictions whatsoever on the disposition or use of the collateral by Jersey Tractor. And what I would argue, Your Honors, As long as the loan was paid. Yes, and it was in fact being paid all the way until April of 2006. And all of the transactions that issued here occurred prior to April of 2006. So they were with Wawel's consent. Those sales of the accounts receivable to Yale during that time prior to April were with consent, because only upon default could Wawel exercise his rights to restrict that collateral. I would argue that as administering, Your Honors, Wawel actually had a floor financing plan. That's how they administered this. I think Your Honors are familiar with that. It's essentially, for example, a car dealership has a line of credit. It uses that line to buy the inventory, which it then sells to its customers. And the sales to its customers are free of the lien of the floor financing company. This was not floor financing. It's not structured as such. I just argue it was administered as such. And Mr. Ransinger, I think in his testimony, essentially said that there were no restrictions. I get from Mr. Ransinger's testimony that, and I think this is true, they were just trying to work this out. They were trying to help him. And I don't see that as being an authorization to sell free of the security interest. Your Honor, I think what Mr. Ransinger's testimony was, was that upon the realization that Jersey Tractor was in default, he tried to work with Wawel. But was it in default? What is the definition of default here under the agreement? The default that was called by Wawel was the failure to pay by Jersey Tractor its monthly obligation. I think that the default goes to when someone who was owed money comes into court saying that I'm owed money, and I don't know that JTTT's Declaration Chapter 11 meets the definition of default under the agreement. I don't know that it does. When you went into court, maybe that's the default. Either way, all of the transactions happened before the default and before Wawel had the right to enforce the security interest. And I think Mr. Ransinger testified, although he also said it was the bankruptcy, he testified that the default had happened several months before when the payments had stopped coming from Jersey Tractor, but that Wawel didn't call it. But exactly, and as Judge Burry's question suggests, banks do that all the time. They don't want to have to work in a bankruptcy, and so they're going to try to make it work. And all kinds of technical and even worse defaults are permitted to extend over a period of time in hopes that you're going to get your balance paid over time, even over an extended period. Absolutely, Your Honor. I see it more than ever now in my practice, for sure. But the point is, I think, under the facts of this case, Wawel decided a default happened when Wawel decided a default happened prior to declaring that default for whatever basis. Jersey Tractor was free to sell those receivables. Speaking only for myself, I think your stronger argument is on the holder in due course. And unless Judge Smith or Judge DuBois have more questions, I'd like to move to that for a moment. Why don't you ask on your applications for more information? Why don't you ask about loans? Why don't you ask about these things? Or maybe you don't want to know. Maybe that's willful blindness. I don't think it is, Your Honor, because the kind of factoring that's practiced by Yale factors is called full notification purchase factoring. The collateral is just what they purchased. They pay value for it. The UCC is structured in Commentary 5 to 9331 expressly discusses the rights of a factor when it requires accounts receivable that are subject to a prior security insurance. Now, a factor, the sole business of a factor is to purchase accounts receivable. Yes? There are two kinds. Factors are often, it's sort of one of those amorphous terms, or ambiguous terms. Factors sometimes do accounts receivable asset-based financing companies like Wells Fargo and Foothill Capital and those kinds of people don't acquire by sale the accounts receivable that they're financing. Full notification purchase factors such as Yale, which is unfortunately now defunct, but others like it, they actually, it's a true sale. But it is of accounts receivable. That's correct. All right. Because that, parenthetically, would go to Wall Wall's knowledge, which I'm going to ask your friend about. On the question of what JTTT can do with its accounts, there are warranties and representations in the security agreement. And among other things, JTTT warrants that I will collect all accounts until you tell me otherwise. I will keep the proceeds from all accounts and any goods which are returned to me. And you haven't argued, no one has argued in the case, that that is a provision of the agreement that was breached by JTTT entering into the factory agreement. I'm sorry, just a question. The reason it hasn't been argued is because of Mr. Ranzinger's trial admission that JTTT was free to do whatever it wished with the proceeds notwithstanding the terms of the security agreement. So I think the administration might have been slightly different than the literal language. Talking about the holder in due course issue, just what would a proper search, a UCC search have disclosed with regard to the financing statement filed by Walwell? Would it have disclosed specifically? That's almost a leading question. Would it have disclosed anything at all with regard to the accounts receivable, restrictions on the accounts receivable? The short answer is yes. A differently conceived UCC search would have disclosed Walwell's lien. I wouldn't call it a proper UCC search.  The phrase is reasonable, isn't it? It's commercial reasonableness, that's right. And in that regard, the court is certainly aware that Yale searched under the name Jersey Tractor Trailer Training and did not search under the official corporate name of Jersey Tractor Trailer Training, Inc. A search conducted on a service called iLean, which is an online lien search, under Jersey Tractor Trailer Training, Inc. did disclose, after all this came to light, Walwell's lien. The Dun & Bradstreet searches that were conducted every month during the factoring agreement disclosed liens on Jersey Tractor Trailer Training, Jersey Tractor Trailer Training, Inc. And William Bruce Hollis... See, that's very important. Those two, in the record, you've got them at 771. In my book, Judge, they're important. Where even under the, quote-unquote, wrong name, they pulled up, D&B pulled up Yale Factors, New Jersey, Inc. Yeah, pulled up Jersey Tractor Trailer Training, that's right. Excuse me. Sorry. Jersey Tractor Training, Inc. Yes. There's still no explanation why they didn't pull up Walwell. Maybe they're the next defendant in the case. No, and that is exactly one of my points. I think a commercially reasonable search, and we cite to the search standards identified by the IACA, which is the body of state and federal officials who govern that. Now, you never presented that to the bankruptcy court. We did not. I didn't learn of the IACA standard until we were on appeal. So it's a very, to me, the holder in due course argument is all about these searches and whether you were required to use the word Inc. Right. What you didn't present, what I suggest perhaps we could consider as a matter of law, is the recitation of New Jersey procedure, which would say you don't use the noise words like Inc. to do a proper, a reasonable search. I think that's right. I think the search criteria have evolved over time to reflect online searching as opposed to a person literally going to the county offices and doing a hand-by-hand search. So the broader search term is the more appropriate term, I think, as a matter of law. And that's one of the issues that is most important for this court. I think whatever way this court goes in this case, and obviously would urge strobing or reversal, I think it's important to get some of the errors in the process along the way straightened out so that there aren't artificial criteria that apply to insecure creditors. Is how a bank acts in a commercially reasonable manner a question of law or a question of fact? I don't know that that's been briefed, and I also took a quick look at a New Jersey case that I don't believe was cited in the briefs, Valley National Bank versus check cashing. It's a check case. It's not a factoring case like this, but it contains language that the issue of whether a bank has acted in a commercially reasonable manner is generally a question of fact. Do you know anything about that? I don't, Your Honor. I'm not having you briefed it, but I would think that it is like almost everything a question, a mixed question of law. In fact, the legal standard is going to apply in this case. I think the argument would be that Walwell did not have in place or did not follow commercially reasonable standards to ensure that the people within Walwell had knowledge of the factoring of the borrower. The bankruptcy court went a step farther than just relying upon the, quote, defective or insufficient name search. Did it not? The bankruptcy judge placed weight on the fact that a search of JTT, revealing no significant secured bank debt at a time when the company faced liquidity issues, necessitating the use of a factor, should have raised red flags. Didn't the bankruptcy court, in its determination of a lack of commercial reasonableness, base that determination, whether it's a finding of fact or a conclusion of law, on both the search and what was done here in the face of considerable business problems that Yale had to know JTTT was experiencing? The bankruptcy judge did that, Your Honor. And I think it was one of the most dangerous things that Judge Kaplan did. It was nothing in the factual record to give Judge Kaplan a basis for holding as an industry standard that a factor is confronted with a red flag because its potential factoring client has financial difficulties. It is almost the sine qua non of a factoring client that it has financial difficulties. Isn't that what he's saying? But that doesn't mean that they will have bank debt. It doesn't require further insurance. Secured bank debt. He used the phrase secured bank debt. Right. And my point is, and we cite one case, and frankly, I could only find one case, and I think it's a New Jersey tax court case, where it says that factoring clients will often not have any bank debt because they're not credit worthy. They can't get bank debt. That's why they go with factoring clients. On the holder in due course argument, there's an issue that the bankruptcy court took out of the case. It's a non-issue, and that is whether these accounts receivable were assigned constituted instruments. The bankruptcy court says that before I can assess whether Yale may qualify as a holder in due course, I must first determine whether JTTT's accounts receivable may be considered instruments. The authority for that proposition, for whether accounts receivable are instruments, is a little on the sparse side. It is a little on the sparse side, I think. Is that because they're not instruments? No, I think it's because they are instruments. 910247, an instrument for purposes of Article 9, is defined as any writing that evidences a right to payment of a monetary obligation that is not itself a security agreement or a lease, and is the type that in the ordinary course of business is transferred by delivery with necessary endorsement or assignment. And that's cited in the footnote in the bankruptcy court's opinion? Yes. I don't think that was disputed. It was not disputed, although I understand that the authority of holding that accounts receivable are instruments, if not non-existent, certainly sparse. But I think under this definition, that is sufficient to encompass accounts receivable, and as I spent some late hours last night reappointing myself with some of the niceties of the argument, I found in White and Summers their reference to the juxtaposition in the definitions between negotiable instruments under other provisions of the UCC and an instrument under Article 9, which supports but certainly does not directly hold that accounts receivable. We were not reading White and Summers last night, but we were reading it the night before. We were reading 29,000 pages of records. We read very little else. I just want to point out that our appendix is only about 800. This is not the 29,000-page record, is it? Is it your position that under UCC 9331, even if you conducted a proper quote-unquote search, you would not have learned of any restriction on JTTT's right to sell, correct? That's correct. So you're essentially making a harmless error argument here. That's exactly the argument we're making. No matter what they could have done, they would not have learned that the factoring violated the security of the instrument because what was publicly filed did not contain any such restriction. We'll get you back on rebuttal. Thank you. Thank you. Mr. Monahan, didn't the bankruptcy court err in concluding that Wal-Wal had no knowledge of the factoring agreement? No, Your Honor. The court made a clear, factual analysis, which I think is very significant here. One point, and I'm going to defer for just one moment, and I want to make sure one issue is clear, and it's part of the fact that maybe you've been doing this for 25 years, you don't think you'll be surprised by something at trial. I was. I believe Mr. Gray was surprised at the trial. One of the issues that came up was the fact that—and we've dealt with many issues with Mr. Gray to the extent of saying, well, the search was improper. The search was under the wrong name. They didn't even get there to that point during this trial, which was pointed out by both courts, Judge Cooper and Judge Kaplan. What they got to the point was, under credibility analysis, they couldn't establish that they had even conducted a search. They couldn't establish it was an interesting part of the trial to the extent that Mr. Gray— Well, but the bankruptcy judge never made a factual determination that there was no search done, did he? In fact, there is no question when you read the bankruptcy judge's opinion, his unease over whether a search was done is almost palpable, but he never made a factual determination to that extent. All he did was cast some doubt on Mr. Herkel's credibility. You have searches in the record. The searches, Your Honor, were all made after. Oh, I see what you're saying. It actually was pointed out by the court in its memorandum opinion. The court placed a burden on Yale and said it was incumbent upon Yale as a participant in the financial lending community to review the search results and undertake all necessary follow-up. The court can only assume that Herkel's inexperience was a factor. The court stated, moreover— There was no transfer of funds until after the searches were performed here. There is no evidence other than Mr. Herkel's testimony, which in my view is evidence that there was a search that preceded the entry into the agreement, correct? There was no search, Your Honor. Mr. Herkel said he couldn't corroborate. He said there was a search, but I don't have the bill. I don't have a record. He did say there was a search before the agreement was entered into. Then the agreement was entered into. Then there were searches, and those searches by D&V occurred before there was any transfer of funds, correct? That's accurate. That was not testified to with regard to the trial. But the court pointed out on a credibility analysis, and it weighed the credibility of all the witnesses, most significantly that Mr. Herkel was able to produce all the ones after entering into the agreement but was not able to produce— What is the importance of that? The significance, Your Honor, is that all Mr. Herkel had to do to sustain his burden on that issue was to contact the Nebraska State and say, provide me the bill, provide me a copy of the search. Well, the searches that came up afterwards that are in the record showed JTTT, Inc. on a lien that had been terminated. So let's assume D&V had done an earlier search. Wouldn't you assume the same thing would have shown up? Your Honor, if the proper name was typed in, that's the point. But the proper name wasn't typed in on the ones in the record, and it pulled up a satisfied lien with ink on it. Yes, Your Honor, I understand that. Can we go back and answer my question, the one I gave you initially? I'm sorry. Didn't the bankruptcy court err in finding that Wawel had no knowledge of the factoring agreement? Yes, Your Honor, they did not err with regard to that. There was factually sensitive analysis, once again, which the court made a determination. What was raised by Yale was the factor of, in a sense, subjective information. First of all, there was no communication by Yale and Wawel. All right, let me stop you. Let me ask you about the testimony with reference to the four officers of Wawel who were authorized to receive, and indeed did receive, phone confirmations in substantial detail of 199 transfers of over a million dollars. Correct? The bankruptcy court and the district court don't refer to the phone confirmations, which are, in my view, and those four officers, Mr. Rancico testified,  that certainly seems to me to be knowledge of the factoring, that factoring was occurring as opposed necessarily to evidence of the factoring agreement. You also had the wire transfers. You had the faxes, and it was listed on each of them as Yale factoring, not just Yale, but Yale factoring New Jersey LLC. So there was enormous evidence in this record, as far as I'm concerned, that a factor was involved, and the name of the factor was Yale. And a factor deals only in accounts receivable. Your Honor, to address your question, the evidence that was listed at trial was very significant. It was provided by Mr. Rancic. These were all low-level people. No, no, no. That was the wire transfers. I'm talking about the phone confirmations to the four officers. The phone confirmations would only deal with the fact that a wire was, in a sense, sent in and received. Not the testimony. Not the testimony. You got the testimony of the woman from the, what is the bank, FD, whatever it is. It was the clearing bank. The clearing bank. There was another bank, Your Honor. That she called the treasurer of Wawa every time a wire transfer was made and, in substantial detail, told her what she had to know, who the beneficiary was, who the originator was. Neither court deals with that. Neither court goes into it. Your Honor, there was, however, an analysis made by the court as to all of that information to the extent that it says that the lower-level people, which would have included the person you're referencing, were not listening. No, no, no. Because Mr. Ratzinger said those four people were authorized to bind the bank. He distinguishes the low-level people in the fact that he never saw anything. He never saw the biggest commercial loan. He never saw any fax. He never saw any transfer. He never saw anything. The only people who saw the wire transfer were the low-level people. He doesn't deal with phone confirmations. But he does say that those four people were authorized to bind the bank. I keep repeating myself, but I won't now. Your Honor, my point is, I guess it's to deal with the issue of authorization. Mr. Percal's testimony would be that if he had known about WADA, he would have been required to obtain a subordination agreement. To say that there were wires into the bank and that was full authorization to hang knowledge of a factoring relationship with a detailed agreement with regard to those did not rise to the appropriate standard. That would put the low-level people or other people involved in the bank the obligation to, in a sense, research that issue and deal with that issue. This all was very simple. If Mr. Percal had done what he was supposed to do and done a search at the very beginning and contacted WADA upon finding WADA, he may have gotten a subordination agreement. It may have been possible. There may have occurred a meeting that occurred when everything was found out. That didn't occur because WADA was never provided that opportunity. Can we move to the Holder in Due Course for a moment? Yes, Your Honor. Can we say that a lien search that follows New Jersey procedure is commercially unreasonable? Your Honor, with regard to that, first of all, the information supplied, as Your Honor indicated earlier, in the reply brief was never raised at the trial as the standard. Shall we remand to the bankruptcy, to the district court, to remand to the bankruptcy judge to consider this information? That would be a reopening of the evidence at the trial, Your Honor. The trial is over. It's completed. That doesn't answer the question. With regard to that issue. That's assuming what we're talking about is not a legal issue. Can you say that factually, Your Honor? The point with regard to that is there's no need to remand that. First of all, all that's cited is information that's obtained from the internet. There was no expert that testified to this issue at the time of trial saying that was commercially reasonable. You also have the other factor that the court did point out, that no evidence was produced by Yale on the issue of whether they had in fact done a search. All right. We were there about ten minutes ago, and I asked a question, the answer to which was not forthcoming, or at least not in a way that was understandable to me. You are not suggesting, are you, that the bankruptcy court made any factual determination to the effect that Yale did not conduct such an initial search? There's no specific statement that the court made that specific point, Your Honor. Would you concede that as far as the bankruptcy court went was to cast doubt on Mr. Perkle's credibility, and perhaps Mr. Perkle's credibility on that issue as well? I think that's accurate, Your Honor. I also believe that in analyzing credibility, the court very clearly put substantial evidence on Mr. Ranzig's credibility. Well, sure. But the bankruptcy court could have made a factual determination on this record based upon what he clearly considered to be Mr. Perkle's questionable credibility, but did not, right? I believe that's accurate, Your Honor. Let's go back to the New Jersey procedures that were not presented to the bankruptcy court. Was it under those procedures? No. The searches that were done appropriately designed under New Jersey law. I mean, if those procedures had been before the bankruptcy court, would not the bankruptcy judge have had to find that the searches that were done were appropriately designed? And if they were appropriately designed, how can that not be a search done in good faith? How can there be a lack of good faith when you go forward with an appropriately designed search? Your Honor, first of all, what's cited in the reply brief as to the legal standard is something referred to as the model rules of the International Association of Commercial Administrators. But New Jersey has adopted them. That's New Jersey law, isn't it? Your Honor, under the circumstances, there was no specific case that addressed whether that's applicable or whether that is the standard. But if that is the standard, then the search was appropriately designed, and it cannot be not in good faith then. The bankruptcy judge's finding would have had to be wrong as to at least that aspect of the analysis. It would appear that under the IACA, if that were to apply, that because of the buzzwords, et cetera... Wouldn't we find as a matter of law that it would apply if it's been adopted by New Jersey? Your Honor, I don't believe that there's anything in the reply brief that indicates that it has been specifically adopted. Well, there is a statement. There's a statement, but there's no conclusory law with regard to it. This is information that there has to be some specific adoption with regard to this, and the entire part of that code, once again, never raised at trial, never been raised at any point in time throughout this matter, Your Honor. Well, they've argued that they were a holder in due course. That's accurate. I'm sorry, go ahead. The bankruptcy court found that it was not a holder in due course for essentially two reasons. One, the search that we've been talking about, and two, this red flag argument, the failure to note the significance of the absence of secured bank debt. If the search had been properly conducted, I'm led to believe that it would not have disclosed any restriction on the ability of JTTT to factor its accounts receivable. Is that a correct statement? No, Your Honor. To the extent that Mr. McCall's testimony alone would be, his testimony was the fact that if Wildwell had, in a sense, been kicked out by the search, and that's his testimony, that he would have had to go through Wildwell to get a subordination agreement. Well, it's also said that if they were aware of the factoring agreement, Wildwell was aware of the factoring agreement, they would have canceled the loan or declared it default. But the statement, the financial statement that was filed, the UCC financing statement, did not disclose any restrictions on the ability to transfer accounts receivable, did it? It did indicate, it did list as part of a collateral the accounts receivable, Your Honor. But the testimony of Mr. Ranziger was that there was no specific restriction on that. Well, then, what about the harmless error argument that Yale has offered? That so what, we didn't pick it up? If we had picked it up, we would have gone ahead anyway. No, Your Honor. Under the circumstances, Mr. McCall's testimony would have needed a subordination agreement to, in a sense, so that the security interest wouldn't follow that relationship. That doesn't necessarily mean that they wouldn't have created some relationship at some point in time, but he took the risk that the security interest would follow. The subordination agreement would have negated that risk. Thank you. Well, how would he have known? I mean, you said what he would have done, but he never knew, and he wouldn't have found out anyway. I believe the court indicated that he had acted in a commercially reasonable fashion. In a sense, this would create a situation where a factor would not have to do any form of search. He could just enter into any relationship he wanted to and not have to worry about any security interest. That would create that environment. Well, how would they have known of the security interest if they conducted a commercially reasonable search and no security interest came up, which is what happened here. Walwell didn't show. Under the New Jersey procedure that has been adopted, Walwell didn't show up on the searches that were conducted, correct? So what would you have had Yale do then? Yale could have been one of the others. It had to find out about the security interest somehow. They did the searches. They didn't come up, so now you're saying they should have done, and you talk about subordination agreements. Yeah, but they had to know there was a security agreement, and they didn't from the searches. What other steps should Yale have taken? This was another element that was dealt with at the trial. It was the investigation of JTT. So even though nothing came up, they had to then go out and investigate and find that indeed JTT had a loan from Walwell because only then do you get to what Percow should have subordinated or whatever it is, right? So there had to be a further investigation even though the searches came up clean. The court dealt with the issue of the due diligence that was conducted by Mr. Percow and Yale. Under the circumstances, they didn't even look at the thing. They required two bank statements. They didn't require any information with regard to outstanding loans or anything along those lines. They were given the opportunity to speak with the accountant. Well, that was on the application. They didn't require anything on the application with reference to loans. Once they entered into the agreement, they did the searches, and nothing came up about Walwell. Now you're saying there should have been a lot more investigation. Then they would have found out, and then Percow would have gotten the subordination. It's more than just there is a security interest, and they should have done some. It's not that simple. Well, Your Honor, I believe that Yale cannot be put in the position of being able to just enter into these agreements without conducting any form of due diligence. The court even points out the fact that if an entity enters into a relationship with a factor, that the usual belief is that they are not able to find financing or that they are having financial difficulties. I think the due diligence goes two ways. I don't think anybody necessarily, at least at this record, was guarding the chicken coop at Walwell. You had a million dollars in transfers on the name of a factor, and the biggest single commercial account they had, and nobody seems to know anything that's going on. Your Honor, the one point that was indicated by the court was the credibility of the principal of JTT, to the extent that that information was concealed. Walwell entered into a relationship, provided funds to keep JTT alive, and did so under the belief that... He didn't tell Beck, and he didn't tell Yale. He wanted to keep his business going. His testimony was that he did, in fact, tell Yale of the existence. And Yale told Mr. Burkow that... Not at the beginning. He backed right off that, though. When he was in the next couple of questions, he didn't know. He was just trying to keep his business going. Your Honor, I understand. His testimony was to that fact that the judge made credibility analysis with regard to all three of the key witnesses. Yes. And he did negate the principal of JTT's testimony. However, Your Honor, the burden, I believe, and the court points out that the burden is on Yale, under the circumstances, to determine what's out there, what relationship am I setting up. They cannot go blindly into a relationship of this fashion without doing some form of due diligence, doing some form of investigation. Once again, that plays no, in a sense, obligation on behalf of a factor. At the risk of repeating myself, that's why they did the searches. Well... All right. I think we've beaten that area to death. You're running out of time, or you've run out of time, so tell us anything that you've not been able to tell, because I keep talking so much, and I promise not to say a word. Well, Your Honor, I believe that, under the circumstances, the determinations, not only by Judge Kaplan and Judge Cooper, were based on proper factual analysis and supported in the record. There was no erroneousness with regard to any of these determinations. I believe, and it's the position of the Longwood Savings Bank, that this is the third bite of the apple, that, under the circumstances that they are applying or attacking on a factual level, all of the analysis that was done by the court, the court had, under the existing law, the ability to make those determinations, did so, and their decisions should be affirmed. Thank you, Mr. Rowe. Thank you, Your Honor. Rebuttal? Thank you, Your Honor. I just want to briefly note the runt of the argument letter that hasn't been addressed, which is the purchaser of instruments argument under 9.330. It is a fairly straightforward analysis that the courts below paid very little attention to, but under 9.330d, it is provided that the purchaser of instruments takes priority over other security interests in that instrument if the purchaser gives value and takes possession of the instrument in good faith and without knowledge that the purchase violates the rights of the secured creditor. It is a more direct and straightforward analysis than the pure older and new course argument, and I think it is equally applicable here. I also note that under Article 1205, knowledge is defined as actual knowledge. Here, I think it's in dispute that the Yale had no actual knowledge of the Walwell security interest, and it clearly gave value as held by the courts below. What do you think your best argument here is? The one I just made and the older and new course argument. I think the consent argument has merit, has value, but I don't know that it's the strongest argument. I think the purchaser of instruments under 9.330 and the older and new course under 9.331 are the stronger of the arguments because, as the comments to those UCC sections provide, they expressly deal with the position of accounts receivable financing, which is junior to a prior secured interest and what that entity's rights are. They expressly deal with the situation. I just want to point out one or two other things. The search issue, your Honor, quite correctly pointed out that there was evidence in the record that searches were conducted prior to Jersey Tractor and Yale entering into the factory relationship. That testimony was unrebutted. In other words, prior to the exchange of funds, not before the agreement. Only Mr. Percal testimony as to a search without any corroboration. That's correct. Thereafter, there were six, I believe, searches admitted as evidence, all of which preceded fundings that are at issue in this case. So there's no question that the search was done, at least one search was done, prior to the fundings that caused the damages here. I also want to note that as we practice law over time, we find ourselves sometimes doing involuntary pro bono work. The appeal below and disappeal sort of fall into that. But I'm taking them in part, of course, because they're important to Yale, but also in part because they're important to the industry. The process by which the courts below reached their decisions, I think, were flawed. I have been able to obtain factoring conference information, and I can tell you that some of the findings below are troubling to the industry, and I just want to point out to them because this court is going to be asked to be one of the first courts to speak on these issues under the revised 9-315, and also under 9-330 and 330-1, which I'm sure the court saw under the U.S. Code Annotated have virtually no annotations. But some of the issues that I think need to be cleaned up as we go forward, as the court moves forward, would be the scope of a proper lien search in New Jersey, the effect on a finance company of its potential clients having no secured bank debt. I don't think that's our red flag. I think to call that a red flag is to not recognize what factoring is. What constitutes notice to a bank? There are UCC provisions that talk about what constitutes notice to an organization, and certainly notice to an officer is notice to that organization. The courts below ignored that in holding that because Mr. Ranzinger didn't know, Wallowell didn't know. What constitutes a bank's due diligence in adopting procedures so that the right people get information? The holding below that factoring is an extraordinary financing device, it's been around for centuries, and it's a critical part of commercial commerce. So, Your Honor, as the case moves forward and Your Honor's reached a decision, certainly I think the courts below erred and should be reversed, but I believe the analysis also needs to address those areas, and I appreciate your consideration. Sounds like a very long opinion. The bankruptcy judge did not find, made no findings with reference to Yale taking with knowledge of the security agreement, entering into the factoring agreement with knowledge of the security. I don't think that he reached that question. I think it was implicit but not explicit. Thank you. We will take the case under advisement.